Case 2:19-cv-10890-SJM-APP ECF No. 18 filed 03/29/19 PageID.530 Page 1 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3    THE HUNTINGTON NATIONAL BANK,

 4                    Plaintiff,
      vs.                                Case No. 19-10890
 5                                       Hon. Stephen J. Murphy, III
      SAKTHI AUTOMOTIVE GROUP, et al,
 6
                      Defendants.
 7    _____/

 8              EMERGENCY MOTION TO APPOINT RECEIVER

 9        BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                 United States District Judge
10          Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
11                Detroit, Michigan  48226
                  Thursday, March 28, 2019
12
      APPEARANCES:
13
      For the Plaintiff          SCOTT N. OPINCAR
14    The Huntington Bank:       McDonald Hopkins LLC
                                 600 Superior Avenue, East
15                               Suite 2100
                                 Cleveland, Ohio  44114
16                               216-348-5400

17                               ALEXANDER AYAR
                                 McDonald Hopkins PLC
18                               39533 Woodward Avenue
                                 Suite 318
19                               Bloomfield Hills, Michigan  48304
                                 248-220-1353
20
      For the Defendant          ERNEST J. ESSAD
21    Sakthi Automotive Group,   DAVID SHEAFFER
      et al:                     Williams, Williams, Rattner &
22                               Plunkett, P.C.
                                 380 N. Old Woodward Avenue
23                               Suite 300
                                 Birmingham, Michigan  48009
24                               248-642-0333

25                               (Appearances continued next page)
```

Case 2:19-cv-10890-SJM-APP   ECF No. 18   filed 03/29/19   PageID.531   Page 2 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

2

```
 1   APPEARANCES:  Continued

 2   Interested Party           J. MICHAEL HUGET
     General Motors LLC:        Honigman LLP
 3                              315 East Eisenhower Parkway
                                Suite 100
 4                              Ann Arbor, Michigan  48108
                                734-418-4254
 5
     Interested Party           ARTHUR THOMAS O'REILLY
 6   AAPICO Hitech PLC:         Jones Day
                                150 West Jefferson
 7                              Suite 2100
                                Detroit, Michigan  48226-4438
 8                              313-230-7925

 9                              THOMAS M. WEARSCH
                                Jones Day
10                              North Point
                                901 Lakeside Avenue
11                              Cleveland, Ohio  44114-1190
                                216-586-3939
12

13

14

15

16

17

18

19

20

21

22

23        To obtain a certified copy of this transcript, contact:
           Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
24                     Official Court Reporter
                 (313) 234-2616 • www.transcriptorders.com
25
```

1

TABLE OF CONTENTS

2

Page

3

EMERGENCY MOTION TO APPOINT RECEIVER:

4

Motion by Mr. Opincar................................7
Response by Mr. Essad.............................15

5

Reply by Mr. Opincar.............................20
Comments by Mr. Huget............................22

6

Taken Under Advisement by the Court.................24

7

8

9

10

11

12

13

14

15

16

17

EXHIBITS

18

Identification                    Offered    Received

19

NONE

20

21

22

23

24

25

1          Detroit, Michigan

2          Thursday, March 28, 2019

3                    _   _   _

4          (Proceedings commenced at 10:57 a.m., all parties

5          present)

6          THE CLERK:  The Court calls Case No. 19-cv-10890,

7   Huntington National Bank versus Sakthi Automotive Group.

8          Counsel, please state your appearances for the

9   record.

10          MR. OPINCAR:  Good morning, Your Honor.  Scott

11   Opincar and Alexander Ayar of McDonald Hopkins on behalf of the

12   Huntington National Bank, successor by merger to FirstMerit

13   Bank.  Also with me in court today, Your Honor, I have Glenn

14   Bartley and Barry O'Neall, each Senior Vice Presidents with the

15   Huntington National Bank.

16          THE COURT:  Okay.  Welcome.  Who -- welcome.  Who's

17   Alex?  Oh, hello.  I was going to call you Mike.

18          MR. HUGET:  I am Mike.

19          THE COURT:  Yeah.

20          MR. HUGET:  Yes.  Good morning, Your Honor.  Michael

21   Huget on behalf of General Motors.  We're not a non-party but

22   we have an interest in this -- in this matter that I can

23   explain a little later.

24          THE COURT:  All right.

25          MR. HUGET:  And with me in the courtroom is Aaron

1   Silver of the General Motors legal staff.

2           THE COURT:  All right.  Okay.

3           THE COURT REPORTER:  I'm sorry, what was the last

4   name?

5           MR. HUGET:  Aaron Silver.

6           THE COURT REPORTER:  Silver.  Thank you.

7           MR. HUGET:  Thank you.

8           THE COURT:  Okay.  And I was going to --

9           MR. O'REILLY:  Good morning, Your Honor.

10          THE COURT:  -- call you Arthur, but that's -- Mr.

11  O'Reilly and Mr. Huget are here, right?

12          MR. O'REILLY:  Your Honor, Arthur O'Reilly from the

13  Jones Day firm representing AAPICO, A-A-P-I-C-O, Hitech PLC.

14  With me is also my partner from our Ohio office, Tom Wearsch.

15          THE COURT:  All right.  Who's Alex?  You're Alex?

16          MR. AYAR:  Yeah, Alex Ayar, Your Honor.

17          THE COURT:  Are you from Cleveland?

18          MR. AYAR:  No, Your Honor, I'm from the Detroit

19  office.

20          THE COURT:  All right.  Make sure you file an

21  appearance on the record because we don't have you on the

22  docket sheet right now, okay?

23          MR. AYAR:  Yes, Your Honor.  I'll be surely -- I

24  thought I did yesterday but I'll confirm that it's on there.

25          THE COURT:  Maybe you did.  As -- whenever I got this

Case 2:19-cv-10890-SJM-APP ECF No. 18 filed 03/29/19 PageID.535 Page 6 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

6

1    from my law clerk, maybe that was before you did it.  So if you

2    did --

3            MR. AYAR:  Thank you, Your Honor.

4            THE COURT:  -- you're taken care of.

5            MR. OPINCAR:  Your Honor, if -- if I may, this is

6    Scott Opincar.

7            THE COURT:  Yeah.

8            MR. OPINCAR:  The question was for -- for me, Your

9    Honor.  I was admitted December 4th of 2000 [sic] to practice

10   before the Court.  I was having trouble getting my ECF login

11   information, but I did receive it and I did file my Notice of

12   Appearance.

13           THE COURT:  Yeah, I think you're fine.  I just hadn't

14   seen Alex's name before, but anyway.  Well, we don't go on

15   first names in this -- in this courtroom.  I just forgot Mr.

16   Huget's last name.

17           So in any event, let's turn it over to Mr. Essad.  Go

18   right ahead.

19           MR. ESSAD:  Good morning, Your Honor.  Ernest Essad

20   on behalf of all defendants.  With me is David Sheaffer from my

21   office.  We're from Williams, Williams, Rattner & Plunkett.

22           THE COURT:  Right.  Welcome to you and it's nice to

23   see you as well.

24           All right.  FirstMerit was a bank that extended

25   credit and loans, which were memorialized in a number of

1   documents to Sakthi Automotive Group, Sakthi America
2   Corporation, Sakthi Real Estate Holdings and a number of their
3   other -- I mean -- I mean it's a -- it's a very basic case.
4   The bank attempted to secure their obligations with security
5   interests, liens and things of that nature.
6           Huntington says that it holds a perfected security
7   interest in collateral, and -- and now they also claim a
8   default in the amount of $19 million-plus.  The bank sent the
9   defendants a Notice of a Default on -- on March 13th and now
10  they want a temporary restraining order and -- based on the
11  breach of contract in the loan doc -- doc -- memorialized by
12  the loan documents and the appointment of a receiver.
13          So the only reason we're here today is to determine
14  whether I should enter a temporary restraining order and
15  appoint a receiver, and I'd certainly love to hear from Mr.
16  Opincar for that purpose if you want to go ahead.
17          MR. OPINCAR:  Thank you, Your Honor.  Scott Opincar
18  on behalf of the Huntington National Bank.
19          Your Honor, we're faced with a situation where
20  payroll is due tomorrow.  Payroll typically is funded today
21  between 2:00 and 3:00 o'clock p.m.
22          In addition, Your Honor, Huntington, like GM, and
23  GM's counsel is here and you can hear from him, have lost faith
24  in the management of this company.  We've been negotiating back
25  and forth with Sakthi, with GM since November of 2018.  It's

Case 2:19-cv-10890-SJM-APP ECF No. 18 filed 03/29/19 PageID.537 Page 8 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

8

1    been unfulfilled promise after unfulfilled promise.  Numerous

2    events of default exist under our loan documents, and those

3    were evidenced by Mr. O'Neall's affidavit attached as Exhibit A

4    to the motion.

5         In addition, Your Honor, Huntington, based on those

6    defaults, did send out a Notice of Default whereby we notified

7    the defendants that our debt was accelerated and that our

8    obligations to make revolving term loans -- sorry, revolving

9    loans have terminated.  We are making discretionary advances.

10        Your Honor, we've also been in discussions with

11   AAPICO and also GM in connection for a path forward to the

12   extent Your Honor appoints a receiver.  To the extent that a

13   receiver is appointed, there will be a financing motion filed

14   with the Court by the receiver and AAPICO providing for a

15   $25 million facility that will come in in accordance with the

16   Intercreditor Agreement to fund this receivership.

17        In addition, the parties have been negotiating the

18   weekend, wee hours of the morning for the last three days an

19   accommodation agreement that would be proposed with the

20   Receiver whereby GM would agree, subject to certain conditions

21   therein, including, one, stability and a clear path forward,

22   that they will not resource.

23        The major risk here, Your Honor, is that GM

24   resources.  Sakthi is a sole source supplier on certain

25   component parts for their T1XX large SUV and truck platform.

```
 1    They're a just-in-time supplier and there have been
 2    inefficiencies in connection with the production.
 3            There's currently $11 million of premium air freight
 4    charges that could be offset in addition to other charges that
 5    GM could offset.  If GM offsets, Your Honor, we are entitled
 6    under the terms of our loan documents to take a reserve under
 7    the borrowing base.
 8            So to the extent --
 9            THE COURT REPORTER:  Mr. Opincar, I really need you
10    to slow down please.
11            MR. OPINCAR:  Oh, sure thing.  I apologize.
12            It's a -- the issue, Your Honor, is that absent an
13    agreement, GM could offset $11 million of premium air freight
14    that eviscerates the availability under the borrowing base.
15            THE COURT:  Well, what -- what -- what's the evidence
16    that anything bad -- bad is going to happen?  I mean Mr. Essad
17    filed his -- his -- his response today, and it seems to me if
18    the payroll isn't made, that would be one thing, but they
19    haven't defaulted yet.  They haven't suspended operations.
20            I don't -- and obviously you cited Meyer Jewelry, and
21    we all know what the four factors for the issuance of an
22    injunction are.  I was just thinking about this kind of
23    practically.  I -- I -- I learned about this like yesterday
24    when I was reading the charge to a jury in a criminal trial,
25    and so I'm obviously less than 24 hours into this.  But I
```

1    could -- I could preserve the status quo, but I'd -- I'd say

2    okay, Sakthi, continue to -- to operate your plant, continue to

3    pay your employees, continue to supply General Motors, but

4    beyond that, I don't know exactly what else the status quo

5    would -- would -- would -- would be necessarily.

6            MR. OPINCAR:  The -- the issue, Your Honor, in

7    connection with the irreparable harm, is whether or not --

8    again, what accommodations GM will provide.  And again,

9    Huntington is under no obligation to continue to make advances

10   under the revolving loan.  There's discretionary advances.

11           THE COURT:  Right.

12           MR. OPINCAR:  I disagree completely with the

13   unverified statement from Sakthi that no events of default have

14   occurred.  We've taken the time to specifically list those out.

15   There's multiple events of default that have occurred.

16           In addition, as outlined in our agreements, Your

17   Honor, pursuant to the loan documents, there's been an absolute

18   consent to the immediate appointment of a receiver without

19   notice.  For reference, Section 11.5 of the Credit Agreement,

20   Section 7(d) on page 15 of each of the mortgages, Exhibit D and

21   Exhibit E respectfully.

22           THE COURT:  Well, I agree -- all right.  First of

23   all, I -- the affidavit of Mr. O'Neall provides evidence of

24   breach and default.  Now, whether there's defenses and factual

25   matters, that's -- that's going to play out over the week.  So

Case 2:19-cv-10890-SJM-APP   ECF No. 18   filed 03/29/19   PageID.540   Page 11 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

11

1   I certainly think you belong here in terms of being heard on

2   the -- on the TRO.

3          One of the problems I have with the receiver

4   business -- well, let me say a couple of things about the

5   receiver.  *Meyer Jewelry*, beyond what the briefing has said,

6   also stated -- and that's an Eastern Michigan case obviously --

7   "The" -- quote, "The appointment of a receiver is an

8   extraordinary equitable remedy that's justified only in extreme

9   situations."  Of course, the Sixth Circuit said that the role

10  of a receiver is to safeguard disputed assets, to suitably

11  administer the receivership property and to assist the district

12  court in achieving a final equitable distribution of the

13  assets.

14         The plaintiffs here want -- and they have submitted

15  more than 200 pages of loan documents.  They want the receiver

16  to, quote, "employ a consultant to assist in the marketing

17  process pursuant to an engagement agreement on terms and

18  conditions agreed upon by the plaintiff and the receiver

19  without further order of the Court, to retain or terminate any

20  existing professionals of the defendants, including

21  consultants, accountants, attorneys in sole reasonable

22  discretion."  There's nothing in this paragraph 11.5 that deals

23  with any of those things.  I mean what these guys are saying is

24  that you want to do a corporate takeover using the provisions

25  of -- of -- of federal civil rules to do it, and I'm sure

Case 2:19-cv-10890-SJM-APP   ECF No. 18   filed 03/29/19   PageID.541   Page 12 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

12

 1   General Motors would, under the circumstances that Mr. O'Neall

 2   lays out, want different management, but I can't, you know -- I

 3   can't -- go ahead.

 4         MR. OPINCAR:  Your Honor, again, we -- we disagree

 5   strongly with the allegations raised by the defendants in

 6   connection with their defendants' emergency answer.  There's

 7   been no scheme, there isn't any controversy behind the

 8   curtains, Your Honor.  What we have is we have a situation

 9   where this group of debtor defendants, borrowers of Huntington,

10   are bleeding cash, and Mr. O'Neall is prepared to address that.

11   We've addressed it in the affidavit.

12         But the company has incurred additional indebtedness

13   of roughly $20 million since December of '18 on working capital

14   assets.  There was a memorandum of understanding that was

15   specifically referenced in our pleadings in the Twentieth

16   Amendment where there was going to be a capital infusion of

17   $25 million by AAPICO.  Sakthi agreed to that, Your Honor.  We

18   gave him 60 days to close it, and once again that didn't

19   happen.  The forecast in vendor payments exceed the

20   availability under Huntington's line.  Again, there's

21   payroll-related costs of $1.3 million, capital expenditures of

22   967.

23         The interesting also thing, Your Honor, is they talk

24   about they have $2 million and 1.7 of avail -- in availability.

25   The only reason why they have that is because GM was forced in

1    connection to essentially protect its production and purchase

2    participation in Huntington's facility on February 12th and

3    March 15th respectively, less than two weeks ago.  The

4    March 15th was used to provide availability to make payroll.

5    And now here we are today again, Your Honor, on the brink of

6    payroll, and they don't -- they have money, but that money

7    would never have been available unless GM came in and purchased

8    that participation.

9           Their statements completely ignore the reality that

10   they don't have sufficient availability to meet their operating

11   cash needs, and there needs to be an infusion of new financing.

12   Nowhere in their pleadings are they showing up stating that

13   here's a check, Huntington, we're paying you off, or that we

14   have a binding commitment letter from another lender.

15   Essentially they're saying, Huntington, continue to lend.  But

16   once we meet the borrowing base, then there's no further

17   availability.  And if GM isn't willing to put in any new money

18   and if AAPICO isn't willing to put in a $25 million loan

19   outside of a receivership, Your Honor, we're talking, at

20   outright liquidation, the loss of 600 jobs and everybody loses.

21          THE COURT:  Right.

22          MR. OPINCAR:  The receiver is necessary as the

23   condition precedent to make those events happen.

24          THE COURT:  All right.  The bank says that they want

25   apparently the receiver to deal with manufacturing facilities

Case 2:19-cv-10890-SJM-APP   ECF No. 18   filed 03/29/19   PageID.543   Page 14 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

14

1    and business operations located at the locations identified on

2    Exhibit B, but Exhibit B only states, quote, "Any and all real

3    property owned or leased by any defendants."  Do I -- do I have

4    that wrong, because I wasn't able to locate from Exhibit B,

5    drilling down on this, where the -- where the business

6    operations are even located, so I don't quite know what our

7    order would say.

8              MR. OPINCAR:  Your Honor, that Exhibit B can be

9    modified to the extent that that needs to happen, but they have

10   manufacturing operations located at a Detroit campus: West Fort

11   Street, Waterman Street, American Way.  The schedules to the

12   Credit Agreement list the owned property; they're part of

13   Exhibit A.  In addition, there's certain defined terms in the

14   Intercreditor Agreement regarding the real estate collateral

15   and there's legal descriptions attached thereto.

16             THE COURT: All right.  All right.  Let me hear from

17   Mr. Essad briefly and then we'll give you the last word, Mr.

18   Opincar.  Thank you very much for your argument.  I know you're

19   well prepared.  Frankly, you know a lot more about the case

20   than I do at this point and your remarks are very helpful.

21             MR. OPINCAR:  Thank you, Your Honor.

22             THE COURT:  Okay.  Mr. Essad.

23             MR. ESSAD:  Good morning, Your Honor.

24             THE COURT:  Doesn't look like you're in good shape

25   here.  You've been negotiating but haven't made any payments,

Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

15

1   one unfulfilled promise after another, and the -- the -- the --

2   General Motors is -- they rely on your clients and they're very

3   concerned that they're not going to get the output they need to

4   keep their production line in -- in business, and if that -- or

5   going, and if that happens, that's big trouble for everybody.

6   So what -- what -- what -- what is your best argument for

7   avoiding a TRO and imposition of a receiver based on your

8   agreement at paragraph 11.5?  Go right ahead.

9            MR. ESSAD:  Thank you, Your Honor.

10           First, our apologies for the timings on the filing,

11  but --

12           THE COURT:  You don't have to apologize for that.

13  I -- I didn't know anything about this 24 hours ago, so it

14  seems to me you made a yeoman effort to get something on the

15  record.  I'm glad you're here.  Go -- go ahead.

16           MR. ESSAD:  Thank you.

17           THE COURT:  I'm eager to listen to anything you have

18  to say.

19           MR. ESSAD:  Yep.  Your Honor, in the Complaint the

20  bank cites four events of default in paragraph 15, page 5, and

21  we would submit to the Court that none of these are defaults.

22           Number one, yes, they did send us a Notice of the

23  Default.  That they claim that we have generated a significant

24  shortfall due to operating losses.  There were operating

25  losses.  That situation has been corrected.  I have Mr.

1   Manickam here from the company.  He can attest to the company's

2   current financial state.  They do have cash in the bank.  They

3   are able to make payroll.  They are running their production

4   lines.  They've met every requirement that GM has put upon them

5   with respect to the supply of parts.  The parts are critical,

6   as we understand it, to GM.  They go into a particular line

7   which makes up a large part of GM's production models.  That

8   part is being produced, has been produced and will continue to

9   be produced.

10          Now, they make an issue out of a $4 million theft

11  that occurred at -- out of the warehouse in effect.  Parts were

12  stolen, the FBI was called, they were tracked down, two

13  different companies were located as having received the parts.

14  We're currently in negotiations with them to get payment for

15  those parts.  There's an insurance claim which is pending which

16  will cover at least $1 million of any loss and possibly as much

17  as 4 million, which is the -- the claimed entire loss.

18          The inaccurate base certificates that they claim that

19  we submitted, we have no knowledge of what they're talking

20  about.  Huron Consulting, which essentially runs the finances

21  of this company, was hired at the behest of the bank, and the

22  company, the defendants, are paying between 40 and $60,000 a

23  week to the bank's consultant to monitor the cash flows,

24  monitor the finances, and no check can even be cut without

25  Huron Consulting signing off on it.  So the bank already has

1   essentially a de facto receiver over the cash.

2        THE COURT:  They're loaning or they're advancing

3   money to your client that they don't necessarily have to, is

4   that...

5        MR. ESSAD:  I -- I've never seen a bank loan document

6   that says they have to advance money if they decide they don't

7   want to.

8        THE COURT:  Yeah.

9        MR. ESSAD:  Okay.  We have between 11 and $15 million

10   in receivables from GM and Ford.  Typically what happens is we

11   get the receivable, that receivable is tendered to the bank,

12   the bank tenders back to us 85 percent against that receivable.

13   That's where we get our cash until the receivable comes in, in

14   which case the bank gets their 85 percent back plus interest,

15   we get the balance of the cash for our coffers.  That's been

16   the continuing system since they got involved with FirstMerit

17   and subsequently Huntington.

18        Yes, GM's involved.  GM's gotten involved through a

19   participation in the Credit Agreement.  They did so to make

20   sure that the rough times that the company was going through

21   got patched over.  Well, I would submit to the Court that Mr.

22   Manickam who's here will tell the Court that they've gotten

23   past whatever inefficiencies are claimed by the bank.  They've

24   gotten past whatever issues they had for operations and

25   shipping.

Case 2:19-cv-10890-SJM-APP   ECF No. 18   filed 03/29/19   PageID.547   Page 18 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

18

1          The -- the one incredible statement the bank makes as

2     an event of default is that we're near the maximum on our line

3     of credit.  I don't know how getting near the maximum amount on

4     your line of credit is a default under a line of credit.  That

5     just absolutely makes no sense.

6          But there's tremendous harm I would submit to the

7     Court, tremendous harm to the company by appointing a receiver.

8     AAPICO is owed $14 million by March 31st under this agreement

9     that we've attached as an exhibit to our answer.  If AAPICO

10    doesn't get that $14 million, we believe they then will seek to

11    grab control of the company under this so-called memorandum

12    that's there.

13         THE COURT:  Okay.

14         MR. ESSAD:  The company's arranged for the

15    $14 million to be paid to AAPICO by one of their holding

16    companies.  And I know we submitted to the Court this complex,

17    convoluted sort of organizational chart, but that's what

18    exists.

19         THE COURT:  Okay.

20         MR. ESSAD:  The $14 million comes in, AAPICO no

21    longer has an ability to become a majority owner in this

22    company and the existing founding shareholders would remain in

23    control.

24         THE COURT:  All right.

25         MR. ESSAD:  And frankly, Judge, the bank is crying

Case 2:19-cv-10890-SJM-APP   ECF No. 18   filed 03/29/19   PageID.548   Page 19 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

19

1    wolf here: there's a default, there's a default, there's a

2    default.  The four things that they cite, none of them are

3    default.

4          The -- the one last item that they claim is a default

5    is this Wayne County lawsuit.  They claim that that is a

6    default under 5.9 of the Credit Agreement: "Solvency, No

7    Litigation, No Violation, ERISA."  If the Court were to read

8    that, especially paragraph 5.9 sub(b), the Court would see that

9    the litigation which is pending in Wayne County must be -- must

10   have a material adverse effect on the company.  Well, a closer

11   look at the --

12         THE COURT:  I -- I don't know.  I -- I'm not going to

13   be able to figure that out now, although I understand your

14   position, and I think I have your entire position based on your

15   filing this morning and the arguments you made.  Is there

16   anything else you'd like to say as to the four factors or the

17   remedy of a receiver before we give Mr. Opincar the last shot

18   at it?

19         MR. ESSAD:  We -- we think the -- the Court obviously

20   correctly cites that -- that a receivership is an extraordinary

21   remedy, that they're not talking about any irreparable harm to

22   anybody here, and -- but the Court early on mentioned a status

23   quo order and we think that might be the right remedy at this

24   point in time.

25         THE COURT:  All right.

```
 1            MR. ESSAD:  And if we're going to default, if we're
 2    not going to make payroll, you're going to know that.
 3            THE COURT:  Right.
 4            MR. ESSAD:  And you're going to know that in the next
 5    week or so.
 6            THE COURT:  Right.
 7            MR. ESSAD:  So that's what I would request.
 8            THE COURT:  That's one of the ideas that I have.
 9    Okay.  All right.  Very good.
10            MR. ESSAD:  Thank you.
11            THE COURT:  All right.  Thank you, Mr. Essad.  I
12    appreciate that very much.
13            MR. OPINCAR:  Your Honor?
14            THE COURT:  Yes, sir.
15            MR. OPINCAR:  If I may, my request -- it seems like
16    counsel's speaking for GM.  GM's here, is present, in addition
17    to AAPICO's here.  Would the Court at least give an
18    opportunity, maybe even just a minute, to hear from GM's
19    counsel?
20            THE COURT:  Maybe a minute, maybe a minute.  But
21    you -- you finish up and --
22            MR. OPINCAR:  Sure.  Well --
23            THE COURT:  -- if Mr. Huget wants to -- to put his
24    client's position on the record, he --
25            MR. OPINCAR:  Yes, Your Honor.  There -- there's not
```

1   just four events of default, and you can try to attempt to poke

2   holes, but there's annual financial statements that haven't

3   been provided.  No monthly financial statements under 9.6 of

4   the Agreement have been provided since December 31 of '18; no

5   operating budget; dysfunction amongst directors that are also

6   shareholders that are suing each other; breach of covenants;

7   change of control.  So there's multiple events of default that

8   are current, Your Honor, and currently exist.

9            In connection with, again, discretionary advances, I

10  believe that the defendants are simply ignoring the fact that

11  on March 14th, in accordance with the terms of the loan

12  documents that they admit in their answer that they signed,

13  that upon the event of default, Huntington can exercise

14  remedies.  One of those remedies is an acceleration of all

15  indebtedness, all indebtedness is immediately due.

16           THE COURT:  Right.

17           MR. OPINCAR:  We don't have any obligation

18  whatsoever, Your Honor, to continue to make discretionary

19  advances.  We could stop today.

20           THE COURT:  Right.

21           MR. OPINCAR:  Your Honor, we don't want to do that.

22  We're trying to work, right, on a process with GM, with others

23  to maximize value of all the collateral, preserve jobs and get

24  to some path.  The problem is is that we've been spinning

25  wheels for four months and we're not getting anywhere.

1    Your Honor, I would like permission please to ask for

2    GM to address the interruption and the irreparable harm to

3    Sakthi to the extent they don't provide the accommodations upon

4    the appointment of a receiver.

5    THE COURT:  Let's hear from Mr. Huget briefly, then

6    I'll say a few things and we'll adjourn for the day.  Thank you

7    again, Mr. Opincar.

8    MR. OPINCAR:  Thank you, Your Honor.

9    THE COURT:  Good morning again, Mr. Huget.

10   MR. HUGET:  Good morning, Your Honor.  Thank you for

11   the opportunity to be heard on behalf of General Motors.  I'll

12   be very brief.

13   THE COURT:  Yes.

14   MR. HUGET:  Your Honor, the Court should be aware

15   that General Motors has made $15 million in loans and incurred

16   more than $11 million of expedited freight, freight charges to

17   keep this plant running.  Without this, all the operations

18   would have shut down and impacted thousands of employees.

19   We don't see any reason -- nothing's changed,

20   nothing's improved.  If the Court doesn't take the drastic

21   action the bank has asked for, we don't see the situation

22   getting better and we see it getting dramatically worse.

23   THE COURT:  Okay.

24   MR. HUGET:  So we -- we would concur on the Court --

25   on Huntington's request for a receiver.

1          THE COURT:  All right.

2          MR. HUGET:  Thank you, Your Honor.

3          THE COURT:  Wait a minute.  Thank you, 15 million,

4    that's in addition to these continuing --

5          MR. HUGET:  Correct.

6          THE COURT:  All right.  Okay.

7          MR. HUGET:  And that those -- those have been going

8    on since September.  October I think was the first loan.  We've

9    been in discussions with them since September.  They've

10   repeatedly told us that without the loans and without the

11   accommodations we've made, that they wouldn't be able to

12   produce parts.  So we don't see -- nothing has changed, and

13   counsel for Sakthi didn't make any representations that

14   anything has changed in that regard, so our -- our concerns

15   about there are the threats of a shutdown are -- are immediate

16   and apparent.

17         THE COURT:  All right.

18         MR. HUGET:  Thank you.

19         THE COURT:  Okay.  Thank you again.  All right.

20   Unfortunately, this isn't the greatest time for an emergency to

21   break out because we've had an awful lot of courtroom activity

22   this week.  However, I hope you know I took this seriously and

23   made time on the -- the calendar.

24         I need to frankly review Mr. Essad's opposition a

25   little more in depth.  I also need to digest what we've talked

Case 2:19-cv-10890-SJM-APP   ECF No. 18   filed 03/29/19   PageID.553   Page 24 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

24

1    about here.  So I'm going to take the motion of Huntington

2    National Bank under advisement for the time being, but I

3    promise you I will get a quick resolution of it on the docket.

4          Should there be a default or a lack of payroll being

5    issued this afternoon or tomorrow, I think you should call the

6    Court right away and we should do a -- a status call.

7          In the meantime, as I undertake to analyze the four

8    factors set forth in *Meyer Jewelry* that the Sixth Circuit

9    pronounced many, many years ago, I'm going to set a

10   continuation of this hearing and call it a -- I'm going to --

11   what I'd like to do is ask for more extensive but quick

12   briefing on a motion for a preliminary injunction which would

13   naturally -- I think you filed for one of those, didn't you,

14   Mr. Opincar?  I'm not a hundred percent familiar with the

15   dock -- you can stay there at your table and just -- did you

16   file for a motion for preliminary injunction as well as the --

17   I think you lodged one of those with your Complaint or am I

18   wrong about that?

19          MR. OPINCAR:  We -- we did provide a separate motion

20   as required by the rule, Your Honor, but it was part of our

21   emergency motion to appoint receiver and for a temporary

22   restraining order.

23          THE COURT:  Right.

24          MR. OPINCAR:  Under 65(b), we believe that we've met

25   the qualifications of 65(b), but it isn't an ex-parte motion,

1    Your Honor.  We did provide notice.

2              THE COURT:  Right, right, right.  Okay.  All right.

3    Good.  I'm going to continue the hearing until April 3, 2:00

4    p.m.; that's next Wednesday afternoon.  We'll have a status

5    conference and/or motion on the what I will call for a

6    preliminary injunction.

7              I will get an order out in the interim on the motion

8    for a temporary restraining order and for appointment of

9    receiver.  I hope to get that out within the next 18 to

10   24 hours.  And then -- and then I'll set a briefing schedule

11   for next Wednesday if we don't -- well, I'll just set a

12   briefing schedule for next Wednesday.

13             So that's the best I can do.  I hope you all have a

14   little patience with me 'cuz I'm -- I'm doing my best.  This is

15   obviously a voluminous matter that I -- I just learned about,

16   but I don't want to make a mistake.  So I have read the

17   Complaint, read the motions, read the motion, read the response

18   of Mr. Essad, conducted a hearing.  I will get a order out on

19   the TRO and receiver forthwith, taking that under advisement

20   right now, and setting a hearing April 3, 2:00 p.m., either a

21   status conference or a continuation of this as we decide

22   whether or not to preliminary -- preliminarily enjoin any

23   behavior of the defendants in the case.  And that's about the

24   best I can do, all right?

25             MR. OPINCAR:  Your Honor, may I ask one question --

1          THE COURT:  Yes.

2          MR. OPINCAR: -- just in connection with the April 3rd

3     hearing?  For purposes of that hearing, and I -- I have no idea

4     what your schedule is, but could that potentially be an

5     evidentiary hearing, Your Honor, so we should plan on calling

6     up these witnesses?

7          THE COURT:  Potentially, yeah, we -- we can talk

8     about that.

9          MR. OPINCAR:  Thank you.

10          THE COURT:  I've got basically nothing that -- that's

11     Wednesday afternoon and that's why I was looking at my computer

12     while you were here 'cuz I was thinking we could clear a couple

13     of hours out for you folks at that time, okay?

14          All right.  Thank you all very much for your hard

15     work.

16          ATTORNEYS (Collectively):  Thank you, Your Honor.

17          THE CLERK:  All rise.  The Court is in recess.

18          (Court in recess at 11:28 a.m.)

19                         —  —  —

20

21

22

23

24

25

Case 2:19-cv-10890-SJM-APP   ECF No. 18   filed 03/29/19   PageID.556   Page 27 of 27
Emergency Motion to Appoint Receiver • Thursday, March 28, 2019

27

1       C E R T I F I C A T I O N

2           I, Linda M. Cavanagh, Official Court Reporter of the

3   United States District Court, Eastern District of Michigan,

4   appointed pursuant to the provisions of Title 28, United States

5   Code, Section 753, do hereby certify that the foregoing pages 1

6   through 26 comprise a full, true and correct transcript of the

7   proceedings held in the matter of The Huntington National Bank

8   vs. Sakthi Automotive Group, et al, Case No. 19-10890, on

9   Thursday, March 28, 2019.

10

11

12                       s/Linda M. Cavanagh
                         Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                       Federal Official Court Reporter
                         United States District Court
14                       Eastern District of Michigan

15

16

17  Date: March 29, 2019
    Detroit, Michigan

18

19

20

21

22

23

24

25